117-1566 Michael Neubauer v. Orland Fire Protection District Good morning, Justices, Counsel, Frank Kras on behalf of the Appellant, Michael Neubauer. We have a case here where the Commission found two issues to which we have brought this case before you. One, that the Petitioner, the Appellant, didn't prove that he had an accident that arose from and was in the course of his employment. The second is that there was no causal relationship between his need for knee surgery and the incident. Let me just try and cut to the chase here. Sure. As I understand it, at the time of the injury, the claimant was participating in an EMS training session that required him to perform CPR on victims in full arrest. Yes, sir. And during the training session, having been in a crouched position, and I understand the evidence, indicates approximately 15 minutes during the CPR is when the injury occurred. Yes, sir. So obviously arguing that it happened in the course of. We are arguing yes. The more dicey issue may be the issue of what happened following this injury. There seems to be some skiing incidents as referred to that some of the doctors, a doctors pointing to that was the real cause of the problem ultimately. So what's your take on that? Yes, Your Honor. The incident was in August of 2014. In March of 2015, the Petitioner reported to the occupational clinic and the doctor, Dr. Young there, noted that he had maybe tweaked his knee, his right knee, having done some skiing. And, in fact, on that date, I believe he was released at MMI by that doctor with a 0% impairment rating. Right. So how do you get around that? What's that? How do you get around that? I get around that by the long-held understanding, I believe anyway, in workers' compensation that a work accident need not be the sole factor in the development of a condition. It need be an aggravating factor to the condition. And here we have it at the start. We have it at the start in August of 2014 where he stands from his crouched position and immediately reports the pain. Dr. Monaco, respondent's expert, gave his opinion following that March 2015 note and didn't, in my recollection, think that skiing was significant to his determination that the claimant had sustained only a knee strain in his incident of August of 2015. Of 2014, excuse me. Notwithstanding Dr. Monaco's opinion that he had sustained only a strain in that incident, Dr. Monaco also still suggests that he needs a diagnostic arthroscopy. So the treatment being recommended by the claimant's physician and the independent medical examiner is the same for this doctor. Who's Dr. Young? Dr. Young is the doctor at the occupational clinic. Was it also her opinion that there was a right knee strain following her appointments with the claimant? She also diagnosed a right knee strain? That's correct. As did Monaco. That is correct. That is correct. So, I mean, we're talking about the threshold issue is whether the accident arises out of his employment. And then only once we knock down that door do we get to what treatment does he need and for what condition. Before the commission, I argued, and I think foolishly, that the act of sustaining a crouch and moving from position to position in a crouch in order to do CPR and IV stimulation, greatly exceeded what the general public might do because who crouches that long? You went off on a neutral risk and you should have been arguing the risk of impartiality. You're right. It was an error on my part and that's why I'm trying to correct that here today. All right. We've had a similar case this week. In this case, however, he was at a training that was required, correct? Absolutely. This was not something that he voluntarily went to and was optional. Correct. It is essential to his job and, therefore, it is an employment-related risk and the commission has erred and its decision is against the manifesto. So it's good that you self-reflected and see you might have made a higher burden for yourself. Correct. We should all self-reflect, I suppose. So once we get past the arising out of the problem, then, again, your point is, well, what happened? And what is the injury and what does he need? And I would argue that, you know, even in this Mitnick case that I referred to, you sort of gave that claimant his condition as well when the commission had found that his condition had so deteriorated that there was no, you know, need for the treatment being recommended as a result of that incident. Here we're talking about sort of the same thing where there's this insinuation that skiing is really the cause for the treatment and my position on it is so is the work accident. And as long as we've got it being a causative factor, then the commission has also erred on the basis of the manifesto with the evidence standard that this claimant needs the surgery recommended by Dr. Ho and Dr. Monaco as a result of that incident at work. And, again, the neutral risk analysis was also an error of the commission and myself. And we should look at this as an employment-related risk and the decision of the commission should be reversed in its entirety. Thank you. Counsel, you may respond. Thank you. Good morning, Justices. May it please the Court. Good morning, Counsel. My name is Steve Burnack. I'm here from Inman and Fitzgibbons on behalf of the Appellee Orland Fire Protection District. As Counsel pointed out, we're here on the appeal of two issues that were tried before the Illinois Workers' Compensation Commission, two issues of fact, one of them being did Mr. Neubauer's claim to accident arise out of his employment, the other one being whether or not that alleged accident was the cause of the injury to his right knee. If I could, very quickly, I'll start first with the causation issue since that's where the Court kind of took opposing counsel. The Illinois Workers' Compensation Commission made its findings of fact that there's no causal connection between the described alleged accident and the right knee condition based upon weighing the opinions of Dr. Ho versus Dr. Monaco. Those are findings of fact that the commission based upon its review of the opinions of both doctors, find Dr. Monaco's opinion to have more credibility than Dr. Ho's primarily because of the fact Dr. Ho had no reference whatsoever or any mention or knowledge or we have any indication of any knowledge of the skiing that Mr. Neubauer did in between the accident and the time of Dr. Monaco. What about his point, though, that has some intuitive appeal? He's saying, okay, well, let's assume he tweaked his knee in the skiing. Let's assume that that happened. There was a preexisting injury allegedly caused in the course of the work, a training exercise. So if he was injured at work legitimately and then he has a tweaked skiing, what about this? The injury doesn't have to be the sole or the primary cause of skiing or the work injury doesn't have to be the sole or the primary. Even if he tweaked it, he should still recover because the initial injury that caused the ultimate condition happened in the course of work. What about that theory? We don't have any opinions to that effect to support that theory in evidence. That's a theory that can be inferred. If the commission had wanted to draw that inference from the medical evidence presented, it could have done that. Is it your position in this case that he didn't injure himself at all during the training? Is that your position? My position is not necessarily that he didn't. And without conceding my action, that's a sticking point here. Did he notice a pain in his knee when he stood up from the squatting when you were in position? Sure he did. And he sought treatment afterwards? And he got treatment afterwards. Now, what was the injury? At best, a strain. Dr. Young was the one who examined him shortly after that, diagnosed him with a strain and released him into a mine. So if anything, if there is an injury, if you find it... It was only a strain, not a... It was a strain knee, nothing more than that. Later we have MRI findings showing that a meniscal injury happens sometime after you've been steamed is when the MRI takes place. So on the causation issue, we believe that the Illinois Workers' Compensation Commission's findings on that are clearly supportive of the evidence and not contrary... Okay, but you want your stronger argument first. What about this in the course of... If a fireman or police officer is at mandatory training, gets injured, isn't there a plethora of cases that say that's a work-related injury? If I go to the accident... Again, we don't want you to concede anything. I know you're very nervous about that because you're on a recording. Right. Notwithstanding that, give us your honest, ethical response to that question. I will concede that at the time of this accident, the alleged accident took place, he was in the course of his employment. Amazing, thank you. I had no problem in the course of it. I don't have a problem in the course of it either, so I'm glad to hear that. That was the time and location. Clearly, he was doing his activities. We're arguing that the risk... To the point, the point of this case isn't in the course of it. Yeah, that's the inherent... What's the real gravamen of this case? It's on the arising out of it. Right. Okay. Our position is, Mr. Umar arose from the squatting, kneeling position and felt pain in his knee. What was he doing as he was rising from that kneeling position? What he had been doing, he'd been down doing this CPR training, but as he'd been grabbing something out of his duffel bag and he came into work and squatting down, he had something out. You can be doing a lot of different activities... 40 to 45 minutes in the crouched position? 15 to 45. We don't know the exact time he was down. There's evidence on the record supporting 40 to 45. Is that right? And there's evidence supporting 15. Okay. Well, take 15 then. Best case scenario for you. That's something that everybody does in daily life? I can tell you that's... Crouched down for 15 minutes. I can tell you that... That's part of your workout routine? Can you tell us that's part of your workout routine? All right. I didn't want to insult you by squatting down for my entire whole argument. But to be honest with you, I understand what you're saying, and I understand what you're saying, but I can tell you that in my job during the day, when I'm working, there's times where I find myself squatting down, and ever since this case, and I've told opposing counselors, I now almost check my watch to see how long I'm squatting down looking at a file on the bottom drawer of a cabinet or getting something at home and working on something at home. I'm squatting in the squatting position doing something with the furnace or whatever I'm doing or painting. We're all squatting and kneeling all day long, and if we start taking a case like this and saying that in this case we have someone who's in the squatting position and kneeling position for 15 minutes, maybe 45 minutes, we don't know exactly the amount of time, and you stand up and you have a pop in your knee, we start doing that for every single case. Think of all the cases we're going to have where anybody does anything that you might do on a daily basis at home or anywhere, and we start saying, well, you're at work, and this kneeling is something you do at work. It's thus, quote, integral, as counsel would argue. Then it's automatically a risk-raising. It's a risk associated with your employment. It's an employment-related risk. We start doing that, and you're going to open Pandora's box every single time. I've been down to pick up a paperclip, and I was taught from my founding partner in our firm to pick up every paperclip we find. You know how many paperclips I pick up during the day? I'm painting all day long. Your employer doesn't have to worry about that. We've got a case on that. Okay, good. Which is inconsistent, by the way. But that's an argument for another day. Right, it's an argument for another day. But the point here is, counsel relies on this Mitnick case, saying that, okay, here, this case follows that pattern. It doesn't. If you look at that case, that's a repetitive trauma claim. That's a totally repetitive trauma case. If you read the facts of that case... Mitnick? Mitnick. How many times? It was one time an hour that we would pick up the whole... And I understand that's exactly what the facts read. But when you read all the facts of that case... I wrote this all day long. Counsel, I wrote it. I understand you did. Okay. But when I read the facts... You drop, on average, one bolt an hour. Right. If you're saying that case was decided on a repetitive trauma basis... But if you read it, if you read the facts of the case, that was a theory of the case going in. And when you read the commission's decision all the way up until it got here, the commission's decision didn't nearly come out until it was a repetitive trauma claim. Yeah, but what happened to the commission's decision? One, they won one-on-one. It was reversed. Right, it was reversed. Because they thought it wasn't an increased risk of offending in one time. So the commission somehow twisted that at the arbitration level to talk about repetitive trauma. The medical evidence has talked about repetitive trauma. He's done this for 19 years, 5 days a week, 8 hours a day. I mean, you can't take that case and look at it in the back and ignore all the other facts that are included in there. They don't exist here. Here, it is a unanimous decision. The individual dropped the bolt. Or the machine dropped the bolt. The individual then dropped the bolt in that case. So it wasn't like the paper clip that you might drop in your office or in our other case where the individual dropped the pen or the pencil. That was something that he did. It wasn't part of his job to pick up that pencil because he dropped it. In Mitnick, it was the machine that dropped the bolt, and it was part of his job to pick up that dropped bolt. Otherwise, the assembly line would come to a screeching halt. So it was a risk distinctly associated with his employment. Mitnick doesn't help you on neutral risk here. Right. It does in this case also include something similar to that. I mean, okay, so he was crouching, but he wasn't just crouching to, as you said, read a file that maybe was specific to your employment. He was doing CPR and medical treatment on a full arrest patient or simulation for the training. Right. I can only tell you that I've never done that in my entire life. So I don't know how common that would be to kneel or crouch and perform that chipping, whatever it takes to get that job done. Much like picking up the bolt. Is this the reason that the machine dropped it as opposed to the high drop? I think what I'm arguing here is it's a very, we're talking, there's a fine line here. If he was kneeling and performing the exercise at the time that his knee bothered him, then we've got to believe that the facts are different. Well, that's what this is. It's all about drawing lines, though. Right. There has to be a line drawn somewhere. And that's what we're drawing a line here is that had he been performing, actually performing the activity and felt the pain in his knee, then I've got a much tougher case because I think the line, I'm on the other side of the line. What has he had to do other than performing for it to be compensable in your mind? If he was actually down there doing activity and in his crouched position and felt a pop in his knee, then I think, now he's doing the CPR training, which is a real part of his job. But then the rising, just because at that point he's taken his hands off of the dummy or whatever it is, he's not actively performing CPR at that point, that then eliminates it from the realm of compensability. Is that really, isn't that the definition of arbitrariness? You've got to draw a line somewhere. Anytime there is a fine line, and you're right, there is a fine line, and it's not an easy line to draw. But if we don't draw a line here somewhere, all I know is he was doing this training exercise. He rose from the crouched position and felt a pain in his knee. Well, we could go back and forth about this all morning, but you indicated you believe your stronger argument and it probably is on the causation issue. They're respectable. See, the problem is you could still do the neutral risk thing. You don't have just quantitative, but you have qualitative. And so we have a crouching position for even 15 minutes. Is that qualitatively different than crouching to pick up something? I don't believe it is. Okay. You say you don't believe it is. And again, if he had testified and if he had said, I was in the crouched position doing the training and actually doing the CPR, doing whatever I'm doing in that crouched position and felt a pain, let's say I were to draw a line and that's what I would do. I understand, but I think you're also, it's like the old shell game, you're looking for the ball bearing under the wrong shell. Okay. But a neutral risk would still give compensability. I don't believe it. No, I know you don't. I understand it. But in terms of an analysis theory is what we're really arguing about here. And there is history on this bench about that. Right. But if you start with a neutral risk and you use qualitative as well as quantitative, an argument can be made by opposing counsel that this is qualitatively good. Okay. By the 15 minutes. Oh. It's the qualitative difference. I'm just, we're talking among ourselves, you understand, up here at the bench, right, at this point. I'm trying to join in, but I'm trying to figure out what I can say. Yeah, well, you may not want to join in on all of the discussion, but I think we understand where your position is on this. I mean, our position is that the Illinois Workers' Compensation Commission weighed all these facts, reviewed all these facts, did a proper analysis, and made a conclusion based on the facts in a not contrary to the manifest way of the evidence. We ask that it not be disturbed in the issue of accident and on the issue of causation. Thank you. Okay. Very good. Thank you, counsel. And thank you for putting up with us. Counsel, you may reply. Sure. Just a moment of rebuttal. Yeah, where is that line drawn? And I think that as soon as he starts doing the training exercise, he's doing it, and rising from it is still part of it. It's essential to his job functions. We do not do the neutral risk analysis. Even if we do, though, I think the 15 minutes greatly exceeds what we do. I haven't followed counsel around with surveillance yet, but I doubt he's crashing for 15 minutes looking at a file. So qualitatively it may be different. Yes. I agree. And my harder argument, of course, is the causal connection. At a minimum, Dr. Monaco says that there's a strain there and that he has that condition. I would stress that Dr. Monaco in his report does reference skiing and basketball, but he doesn't say, I think that because he was skiing that I'm not giving it to him. He just says, I think this is something that was a strain, and for that reason he doesn't need the diagnostic arthroscopy for it. He just needs it generally. And I think that that's against the mechanism of the evidence. And, again, I'd reiterate my request for this court to reverse the decision in its entirety. Thank you. Okay. Well, thank you, Counsel Ball, for your arguments in this matter. It will be taken under advisement. Written disposition shall issue.